May it please the Court, Gregory Garr, on behalf of The Trust, I'd like to reserve, with the Court's permission, three minutes of my time for rebuttal. Sure. Thank you, Your Honors. The Tax Court erred in holding that Section 483 of the Tax Code applies to the $191 million payment at issue in this case. Most fundamentally, the Tax Court erred in three independent respects by failing to give effect to the expressed terms of Section 483. First, the $191 million payment was clearly made in 2002 under the expressed terms of the 2002 settlement agreement. So there was simply no deferred payment to begin with. And just as in the Tribune Publishing case, there's no reason to disregard the expressed terms of that settlement agreement. Couldn't it be a payment under the 2002 agreement but for a 1999 sale? Well, no, Your Honor. I mean, first, I mean, I think that would not be giving effect to the plain terms, which is, you know, is this under, which agreement is this under? And the settlement agreement, of course, makes express that the $191 is paid concurrently with that agreement. I don't think that it can be traced back to the plan of merger in 1991. One, that's inconsistent with the terms of the settlement agreement, which explicitly supersedes all prior agreements, including any agreement surrounding the merger, which, of course, wasn't an agreement. It was a crammed-down attempt, and that supersedes languages at page 668 of the appendix. So the settlement agreement, you know, came in the wake of this Court's decision in the Warden case, in which this Court held that because the litigation was brought before any merger attempt, that the litigation, had it been successful, would have resulted in stopping or completely invalidating the merger. And this pivots a little bit to looking at the case through the lens of the origin of the claim doctrine. But under the lieth decision from the Supreme Court, the Court looks to what would have happened if the parties had fought that litigation to a finish and the trust had prevailed. But why would we prioritize the claim for equitable relief over the claim for the dissenter's rights? Because, Your Honor, again, I mean, this goes to lieth and the way the Supreme Court framed it, and this Court has applied that doctrine in the Francisco case. You look to what would have happened if the trust had prevailed in the litigation, if it had been fought to a finish. In that event, the point of the litigation was to stop the merger, to prevent it from happening. And if the trust had done that. And or to secure your dissenter's rights. I mean, that's also a claim in the complaint. That claim was brought, as the settlement agreement makes express, as a precautionary matter. We brought it to preserve our rights. The point of the litigation was to prevent the merger from ever taking place. And the warden court, this court and warden, recognized that we could have prevailed on that claim. In that event, the appraisal claim would have dropped off. The settlement agreement itself makes clear that the appraisal claim was brought only as a precautionary matter. And treating the settlement agreement as an effort to effectuate the appraisal claim makes no sense. Because not only does the settlement agreement supersede all prior agreements, but the settlement agreement makes clear it's a forward-looking effort to value the shares, not just of the BPSI shares that would have been the subject to any appraisal claim, but also the Zymark shares, which would not have been a part of appraisal claim. And the settlement agreement makes. And do you mean that because there are counts three and ten, which involve the fiduciary duty to preserve the business opportunity of Zymark? Or simply because it was partially owned by BPSI? Well, any appraisal action, Your Honor, and that never happened because the whole point of the litigation was to stop the merger and to prevent any appraisal. But any appraisal action would have been focused on valuating the BPSI shares back in 1999. And the settlement agreement and the evidence makes clear that the 2002 settlement agreement was giving, was a new sale redemption agreement after the level set of the warden litigation. But is that clear? It seems to leave open both parties' position about the timing of the sale. It explicitly says this is BPSI's position as to timing of the sale, and this is the trust's position as to timing of the sale. Well, the settlement agreement is clear that the sale takes place concurrent with the settlement agreement, and the shares would transfer under the settlement agreement. Again, and it wipes clear any prior agreements. It also makes clear that it's a forward-looking valuation. With respect to Zymark, there's even a write-up payment in the settlement agreement that looks to 2002 to 2007. And again, if this were all an effort to go back in time and think of what the shares were valued in 1999, where the other side at that time took the position the shares were only worth $82 million. I mean, the delta from $82 million to $191 million itself is a pretty strong indicator that they were looking at things differently in 2002. So let's just say, though, that that cram down or that squeeze out did happen and was effectuated in 1999, but there was no payment until 2002. Would that cram down, would that constitute a sale or exchange in 1999? No, not within the meaning of 483 because 483 applies to contracts for the sale or exchange. There was no contract. There was no meeting of the minds. They tried to cram this down, and this wasn't a mutual agreement. So maybe we'll take the back. So I hear that there's no sale because, I guess, it was contracts for sale. And then exchange, I mean, the exchange didn't even take place until, I guess, until 2002 until you agreed to exchange. That was what a lot of the fight was over was we actually want that remnant share, and that didn't happen until 2002. That's exactly right, and the settlement agreement makes that expressed in many different ways. It recognizes that BPSI owned all the shares except for the shares subject to litigation, and the settlement agreement clears the way for the transfers of the shares free and clear. And that gives effect to the terms of Section 483, which was, again, the question is whether there's a contract where parties are attempting to essentially provide a loan and a benefit through that where the contract explicitly provides for payments due a year out. And that's another way in which going back to 1999 and even treating the plan of merger as a contract, which it wasn't, there was nothing in there that explicitly provided for payments due a year out. So I guess to break down the settlement agreement into the various streams that it incorporates? No, I don't think so, Your Honor. And, you know, as to the allocation question, the government, in this case, unlike the Dye case or the Francisco case, never sought an allocation. And that makes sense. Well, what are the government's? All right, so you would say the government has waived that? It's waived it, Your Honor. It clearly has. And, again, that's unlike Dye. Also, in the allocation cases, there's typically a prior judgment in which the claims, the amounts are allocated. You don't have that here. And as this court recognized in the Francisco case in Note 15 of its decision, in that case, courts typically assume that the entire amount is tax-free. And that makes sense here because, again, going back as to what happened, we brought the Warden litigation to stop this merger from ever happening. And after this court's decision in Warden, which recognized that we could have done that and voided the merger, the parties level set. They agreed that they were going to wipe the slate claim. The settlement agreement superseded all prior agreements. They were going to provide for a sale or exchange on an equal playing field in 2002 for the 2002 value of the shares. There was no deferred payment part of that. The payment was made concurrently with the settlement agreement. Section 43 has no application to this case. The tax court made it far more difficult than it had to be. And the government recognized all this in the CollarCon litigation that was brought initially. Not only did it say that its position today was wrong, it said it was so wrong that it warranted penalties. And that position is equally as wrong today. So they're allowed to switch their position, but I think what you're saying is we've got to read something from the weight that they weighed in before. Absolutely. I mean, yes, they can switch position. The government does switch position from one circuit to the next. But it doesn't go into one circuit and say you are so wrong we can impose penalties on you under the tax laws because you lack substantial authority, which is what they said in CollarCon, and then turn around a couple years later and say, oh, no, we agree with that position. I mean, I think the court should read a lot into that. And everything that it said in its brief and that it may say today is exactly contrary to what it said in CollarCon as to when the payment was made, as to whether or not in CollarCon they recognized that the settlement agreement superseded all prior agreements. They recognized that the payment was made under the 2002 settlement agreement. They recognized that given the history of the litigation, it made sense to treat the warden decision as a level set, and the parties negotiated on equal playing field in 2002. And following up on consistency on the part of the government, something that should disturb us? I frankly think it should, Your Honor. Again, not just because they took a different position. Because they came into the court in the Court of Federal Claims and said this position is so wrong it warrants penalties under the tax laws. And now they're here today taking that very position. And, of course, I have all due respect for our colleagues from the government. I don't mean to impugn them at all. But I do think that the litigating posture should weigh against them. Oh, just following up on Judge Roth's question earlier, your brief is somewhat, it has sentences that are in tension with each other in the sense that, well, I'm talking about the opening and the reply, and that it says the 191 is entirely for stock, but also says that the non-appraisal claims were, it seems to indicate, were part of the settlement agreement and part of the consideration. So if that's the case, as an objective matter, if the 191 is paying for some non-appraisal claims, aren't those ordinary income? And if so, if that's objectively what the settlement agreement can be read as, what do we do? Where do we go from there? So I don't think so, Your Honor. And I think the way to look at it is that what the settlement agreement did is what the other side wanted is they wanted a mutual, they wanted a complete release of claims because the litigation was standing in the way of their ability to establish an actual exchange of shares. And so we did release all claims so that they could level the playing field for a share, I'm sorry, for an agreement, a sales redemption agreement in 2002 where they could get the shares as they did under the agreement, free and clear of all claims. I mean, any party would want that. Even if there were an existing litigation, they would want a release from any conceivable claims. And, again, going to the way in which they got to the 191 million, Graham Berwyn, who was the – But why isn't the 191 paying in part for those? For instance, counts 3 and 10 have nothing to do with an encumbrance on the claims. So the – I mean, I think that the evidence answers that and that the 199 was clearly an effort to value the Zimark shares and the BPSI shares based on 2002 values. And Graham Berwyn, who was at the heart of the dispute on the other side, recognized that in an email. But that's outside of the settlement agreement. That is outside of the settlement agreement. But if you look at the settlement agreement, there's a write-up payment that looked forward and provided for additional value based on a 2002 to 2007 valuation of the stock. And it's clear. I mean, even if you go back and think, well, gee, they thought it was worth 82 million in 1999, but all of a sudden they arrive at 191 million. All of the evidence in the settlement agreement itself makes clear that that value was for a valuation of the stock, Zimark and BPSI, in 2002. And what they got in exchange was a release of all claims. It wiped clear the litigation. And there was, at that point, a contract for the sale and exchange of the shares. But that contract didn't involve any deferred payment that would trigger Section 483. The payment was made in 2002 with the settlement agreement. So you're saying if we can't divide up the different streams of the settlement and that the settlement was made in 2002, that the whole amount then should be taxed as a capital gain? Yes, exactly. And that's exactly what the Ninth Circuit found in the Tribune Publishing case, which is the closest case that the parties have identified. Involved a prior merger of subsequent settlement agreement, and the court there recognized that 483 didn't apply. You say the government has waived the allocation. If they had not done that, would we then have to divide the settlement into the streams of what came into it? I don't think you would, Your Honor, for this. First of all, I think waiver is a complete answer. But secondly, as this court recognized in the Francisco case, the court really is only engaged in that attempted allocation where you have a prior judgment that actually delineates damages amounts by claim. The court in that case recognized, citing to the First Circuit case, that where you don't have that, any attempt to allocate is really unworkable. And it wouldn't make any sense here where all the evidence shows that the 191 wasn't an effort to attach a value to each individual claim, but rather to recognize that the litigation would go away and you would provide a value for the BPSI and the Zimark stock in 2002. Thank you. We'll hear from you on rebuttal. Thank you, Your Honors. May it please the Court. Julia Vetta for the Commissioner. The merger happened in 1999. Can you keep your voice up, please? Beg your pardon? Can you keep your voice up, please? In 1999, the merger was complete as a matter of state law. The shares were redeemed. The preferred shares were redeemed and the trust received payment for those. The common shares were redeemed and the trust executed their or effectuated their dissenter's rights. Those led to litigation or were incorporated in ongoing litigation, as the court has observed, but did not require anyone to maintain the fiction that the merger had not happened. And when this litigation was resolved in 2002, that was in resolution of that 1999 claim for dissenter's rights, as I believe Judge Chung observed. I would like to speak briefly to Judge Roth's evident concern about a change in government position and a potential waiver here. I think that initially the government viewed this case as one that now the trusts are attempting to argue, and the Court of Federal Claims did not adopt that position. So now one party to this transaction is being treated as having, in fact, they did. As the factual record reflects, they reported BPSI on their tax return that they had paid out $191 million, of which some part of it was an interest deduction. So that is the application of Section 483 as a matter of law to one party to this transaction. It should not trouble the court that the government then wants to apply the same law to both parties to a transaction. To do otherwise would result in disparate treatment of two parties to the identical transaction at the expense of the public fisc, where both would escape taxation on what actually happened, which is a 1999 merger for which they ultimately received fair market value for the 1999 redemption of their shares when the parties were able to agree to that value in 2002. Now what also happened over the course of this negotiation was that the parties contemplated that that amount would contain interest. And this is not, the record is not a model of clarity because they are settlement negotiations and the parties' positions obviously shifted. But the parties were clear that the fair market value as of the first professional valuation received for BPSI and Zymark in February of 2000, which could not reflect a 2002 value, was between $165 and $240 million. When the trust in March of 2000 exercised its dissenter's rights, it said, we request fair market value in lieu of the $82 million payment that is otherwise guaranteed us in this merger agreement. We want $190 million. That was their demand in March of 2000. That was based on a 1999 value for shares that were redeemed in a completed transaction in 1999. I would also like to focus on- Can you address the point made in the trust reply brief in which it says even if this were under the 1999 agreement, 43 wouldn't apply because the only price listed in that agreement is some certain plus 10% interest. While it notes in a different clause that there are dissenter's rights, it doesn't state that as an alternative price. So the merger agreement itself states both a price and adequate interest. Yes, that correctly represents the merger. But what that does as a function of this court's authority and other courts that say you treat this as a contract, you are entitled to as a shareholder under that merger agreement either the payment contemplated on the face of the merger or the exercise of your dissenter's rights. You don't get both. But 483 specifically says it's under the terms of the contract. Right. So that is one of the terms of the contract, and it's the one that the trust chose. Sure, but for that one, for dissenter's rights, it doesn't say within six months or a course of payments. Correct, but there is, I think, a fair presumption that the exercise of dissenter's rights will not happen immediately. The parties are not going to agree to fair market value tomorrow. And quite possibly as a factual matter, if they did, if they had come to an agreement, if the $190 million value proposed in March of 2000 had been accepted, then 483 might not apply there because then your timing requirements are not met. But here they were. It's not a strict timing requirement under the plain text of the statute. The statute requires that the terms of a contract require a payment and that the payment be obligated sort of longer than six months and completed after 12 months. And even though the merger facially did not say you get dissenter's rights, but only if we can agree within six months and pay within 12, or only if we can't agree within six months or not pay within 12, that's contemplated in the scope of the dissenter's rights provisions under Pennsylvania law. It's going to take some time. You have to go through all of these notice requirements. There's a dialogue. There's reaching agreement on the fair market value. And I think now you're in a universe where if that happens quickly, as a matter of fact, on the record before us, we would look at that and say, this didn't take you six months, so the government wouldn't come in and argue that 483, which has a six-month runway, applies. Can I just, you know, it's interesting because in 1999, you know, you say that everything was complete in 1999. But one thing wasn't complete in 1999, and that was sales price. Was sales price fixed in 1999? The fair market value of the trust shares was not fixed in 1999. And so, you know, I'm looking at the text of 483C, and it talks about applying to any payment on account of the sale or exchange of property, which constitutes part or all of the sales price. And so when we want to talk about, do more than six months after the date of such sale or exchange under a contract. And so does that make sense when we want to read what would constitute a valid contract for purposes of 483? When the statute itself mentions sales price, to have an event that doesn't have sales price in it now constitute a sale or exchange, that seems very strange when the statute expressly mentions sales price. And now you have a transaction that doesn't mention price, and you say, no, that qualifies as a sale or exchange. How can that be? In two ways. First of all, the merger agreement does contemplate a sales price, which the parties rejected. The $82 million is facially a price that, had the trusts agreed, would have been promptly paid to extinguish their shares. But again, if they didn't agree, then how do you have a contract? Because a contract's a meeting of minds. The meeting of the minds did not involve the trusts, but the trusts were bound under the contract between the acquiring entity and BPSI. So that might be a separate contract, but is that really a contract for the sale or exchange of property? I mean, it's... This court has so held in Warbleski and other circuits in Solomon and Katkin and the Court of Federal Claims in Jeffers, and even the Ninth Circuit in Tribune said, yes, a merger agreement is effectively a contract in this nature, even though the dissenting shareholders, the minority-squeezed-out parties, clearly don't assent to what's being done here. But it's a transaction that's being conducted on behalf of this corporate entity by its fiduciaries that is binding on all stakeholders. And the courts have agreed that that is enforceably a contract for the purposes of 483. I'd like to speak to your second point, though, which is the dissenter's rights don't come with a sticker price on the face of the merger, and that seems to trouble the court, and I think it need not, because what the agreement in the merger provides to the dissenting shareholders is fair market value. Now, fair market value isn't a sum certain on the date of the merger because dissenter's rights contemplate that they're going to disagree about it. They're preserving in the contract the right to disagree about it, the right to work that out, the right to take that to court, figure out what you can agree on or what a court believes or what your experts believe is the fair market value. And once you have that, however long that takes, then that's a payment under the merger agreement. But it seems that sales price is an essential ingredient to 483. And if sales price isn't set until 2002 and it's an essential part of 483, then how can we begin the counting of the six months in 1999? In two ways. First of all, if the parties had agreed to the sticker price in the merger, then there would be no question. Your concern would not be raised. But because they exercised an alternative right also provided under the contract, you know there's going to be a sale price. They're going to get a sale price. It's a blank in the contract, but it is a contractual obligation. In one of the merger-related cases, there was a line, a holding to the effect of, if this payment wasn't ultimately made, no one could say that the majority stakeholder had met its obligations under the merger agreement. They have to pay fair market value. They must. That sticker price must be tendered, even if it isn't determined agreed to by the parties until much later. If there is no contract and 483 is not applicable, is the IRS up the creek, or are there other statutes that you can depend upon? Well, here the IRS would be in a position where it's treating two parties to the same transaction differently. One of them gets an interest deduction for interest that the other one is deemed not to have been compensated for. So there's a gap there. And as Your Honor noted, and framed it in terms of waiver, but I don't think that this is a government argument, both sides, both BPSI and the trusts, actually took the position that the payment was fully capital. It was in exchange for the fair market value of the shares that were redeemed. And we submit that as a matter of Pennsylvania law, the shares were redeemed in 1999, and that is what the Court of Federal Claims so held when it said that there is a contract here under this merger, 483 does apply, and the BPSI is entitled to claim its interest deduction. So there's interest there that has now been paid in this transaction deemed as a matter of law. If this court were to say, oh, no, there isn't, then we have a discrepancy there that the IRS can't remedy. And a taxpayer on one side of a transaction gets the benefit of an interest payment while the other does not bear the obligation that is incurred by receiving that interest payment. And if both parties agree that it's capital, then does the origin of the claim doctrine have any role to play? It seems like the sole purpose of that is not for timing of the sale, but for the nature of the sale. That's correct. The origin of the claim doctrine would put us in a situation like Judge Roth described where we're teasing out elements of the claim that are ordinary income and our capital gain. And here on a stipulated record on the trust's tax return in their tax court petition, in the statements they made to the Orphans Court, in the position that BPSI took in the Court of Federal Claims, everyone has agreed that this payment was tendered in exchange for redeemed stock only. It was not compensatory of any of the other claims asserted in the litigation. The government made that assertion in the Court of Federal Claims and that assertion was rejected. The trusts renew it here today and have given this court no new reason to believe that their consistent position up until now should adjust in any way. If the accomplishment of the merger depends on state law and the trust is alleging fraud or fundamental unfairness, it seems like fraud has an element of materiality. What does fundamental unfairness require and has the trust shown that prejudice, materiality? I don't think we have arguments to that effect on this record. I don't think we have evidence to that effect on this record. This court can look back at its own earlier opinions in the Wharton litigation to really unpack what the claims were that the parties were struggling with at that time. But I think it is clear that after the court's second Wharton decision, the parties went back to the drawing board and said, this isn't getting us anywhere. We're not going to settle this by fighting over which trustees should resign when, whether the minority stakeholders are being treated in a manner that meets a state law standard of fundamental unfairness. What we need to do is agree on our sticker price. We need to get to a point where we can have a meeting of the minds on what we are owed in exchange for the rights that were ours before our interest in this company was extinguished as a matter of law in 1999. And that is the tact that the negotiation took. And we track that in our brief, how the parties were contemplating that there was interest to be paid because it was taking long enough now that that was going to be an issue, and they knew it. So to the extent that there's any origin of the claim analysis within the scope of Section 483, you can look at this record and say, these are parties who understand that the time value of money is going to represent part of this payment as well. And to the extent that their feelings about that are material to the amount that they agreed to, that would then be included in that payment, which the statute automatically provides for. I just have one follow-up question here, and this is a little bit on Judge Roth's question as well, but your friend on the other side says you waived any allocation issue in this case. That seems to make sense to me. Do you agree with that? Yes. The only issue here is how much of this payment, which is indisputably capital, should be characterized as imputed interest as a matter of law. No other claims survive. Thank you. Thank you. Thank you, Your Honor. Your Honors, four quick points. Number one, there was no contract and no sales price in 1999. My friend pointed to the $82 million note, but that note provided for stated interest, so it wouldn't have triggered 483. And, of course, no note was ever issued. Now, that argument, though, I saw in your reply brief. I never saw that argument in your opening brief, or it doesn't seem like you made that before the tax court. So is that forfeited? I don't think it is, Your Honor. I mean, we've made the argument all along, and I think the second point I wanted to make as to the appraisal rights provision, as you noted correctly, there's nothing in that provision that required a payment within a year out. And there's no reason any appraisal, which, of course, never took place, couldn't have happened within a year. So that's another reason 483 is not triggered. Following up on that, is this an either-or? Either the 1999 merger agreement controls or the settlement agreement, is it possible that there's a payment under the 2002 agreement for a 1999 sale? I don't think so, Your Honor. I mean, that's certainly not the way that the settlement agreement is written, and I think if you look at it under 483, the question is, what was the payment under? And there's an express provision in the 2002 agreement providing for the payment. The government was right in ColorCon when it said in page 19 of its summary judgment brief that they made the settlement payment under an obligation imposed in the settlement agreement, not under the hotly contested merger obligation. My friend is wrong when she says that the 191 was based in an effort to arrive at interest. There's certainly no provision in the settlement agreement that provided for interest. Instead, the settlement agreement makes clear that the 191 was based on a 2002 valuation for the Zimark and the BPSI shares, and the write-up provision in the agreement makes that clear at pages 616 to 612 of the appendix. There's other evidence my friend wants to go outside of the settlement agreement. For example, an email from the vice president of BPSI saying that the valuation was based on a 2003 scorecard, which is the value of the stock in 2003. That's it. Wasn't the trust talking about the capital gains plus interest up until almost the time of the settlement when someone brought the tax implications to its attention and suddenly interest dropped out of its negotiations? So, Your Honor, there were term sheets floated about, but the bottom line is I think you would look to the settlement agreement and look and see what's in the settlement agreement. There's certainly no interest provision in there. There's also very significant evidence that the parties were just trying to provide the 2002 valuation of the stock, and the email that I mentioned at 963 of the appendix looks at that. So I don't think there's any basis for treating a part of the 191 as interest. There was a provision in the agreement that said if there's any dispute about interest, go to an independent party, have them look at it. They did that. The law firm looked at it and said it wasn't interest. And just in closing, the notion that it's somehow unfair to the public fisc to come out differently I don't think can carry the day. We were not a party to the Color Con litigation, the trust that is. The Court of Federal Claims got a one-sided account there. The Court of Federal Claims got it wrong. It should have agreed with the government. The government was right in that case, but two wrongs don't make a right. The government declined to appeal the Color Con decision in that case, and this court owes no deference to that decision whatsoever. It should give effect to the plain terms of Section 483. Thank you, Your Honors. Thank you very much. Thank you. We'll take matter under advisement.